and I'll try to watch the clock and save about three minutes for rebuttal. I would like to focus on my jury instruction claims, and I would like to first address the claim that we raised second in the opening. Well, in your jury instruction claims, I didn't see any objection to them, so they're all here on plain error, right? Well, I think one of them is plain error, the other one we contend are preserved. Well, but did you object? Yes, there was an objection. There was an objection to instruction number 15. That was the first jury instruction claim. He added, Judge Carney added, or negligent. Right, and there was an objection to that instruction. Yeah. I did want to start with the second instructional error first and then pivot back to that one. In that one, there was no objection, and so it is on plain error review. It's our position that after I submitted my opening brief, this Court decided United States v. Shields, and under Shields, it's now clear that there was plain error. Shields held... This is on the duty to disclose issue. Correct. Shields held that in this context, it's error not to give a duty to disclose instruction, and under the Henderson framework for plain error, you take the law at the time of appellate consideration, so we have plain error. So those first two prongs are satisfied. Now, moving to the third and fourth prongs, before I did that, I did want to say that we have a claim that you need to look at both of the instructional errors cumulatively, and because one is preserved, that the prejudice standard should be harmless beyond a reasonable doubt. However, we think we can make out prongs three and four of the plain error test just on the Shields error alone. This case is much more like this Court's decision in Garrido, where this Court found prejudice under the third and fourth prongs of the plain error test for an erroneous fraud instruction that allowed the jury to convict on a nondisclosure theory, and it's much different from Shields in that respect. In this case, the government, the indictment itself, all the witness examinations, and the closing argument heavily relied on an omissions theory of fraud. I mean, that was the first thing they argued in closing was an omissions theory of fraud. That was where they were really emphasizing their case. Here, there is certainly a debate as to whether the jury would have found a trust relationship. In fact, we think that the evidence overwhelmingly shows that there was no trust relationship. If you look at the language in the PPM, which was the private placement memorandum that set forth the terms of the investment, there is warning after warning after warning in capital letters, in bold letters, saying there are conflicts of interest here. Consult with your own advisers. Consult with your own attorneys, your own financial investment advisers, your tax people. There was warning after warning. Can I have you back up on the Shields question for a minute? Because in Shields, the panel said that the error was not plain because it was based on model jury instructions for wire fraud. That's 8.124. That did not include a duty to disclose instruction, and there was no objection below that would have alerted the district court to the potential analysis. Wasn't that exactly this sort of situation? I mean, although Shields came out after this trial, and the district court here, like the district court in Shields, didn't have the benefit of anything other than the model instructions either. How do we distinguish this factual situation from Shields that led to the conclusion in Shields that there was no plain error? Okay, because it gets a little confusing, but what the Supreme Court said in Henderson, and that's actually what this Court's case law has been for a long time, is that for plain error review, the plainness of the error is evaluated at the time of appellate consideration. Now, unfortunately for Mr. Shields, when he came up to this Court, there was no Ninth Circuit precedent that said that this was plain error, that this was error. There was no precedent that said that this was error. Shields was the first case to do so. Unfortunately for Mr. Shields, because there was no precedent at the time, he did not get a showing. He could not make out a showing of plain error. But we're in a different posture now under Henderson. Shields now exists. That is this Court's binding case law. And you take the law as it stands today. Frankly, you take the case law, even if it were to come out after we had oral argument, you would still, if the case had not been decided, you would still take the case law at the time if I filed a 28-J saying, listen, there's a new case. You look at the case law right now, and right now, under Henderson, the error is plain. So that's why we clearly get through prongs one and two, and it just becomes a third and fourth prong analysis. But, Mr. Coleman, the second reason for the affirmation as opposed to new trial in Shields is as follows. It says it is also unlikely that the error affected the outcome of proceedings because a jury convicting based on defendant's material omissions would most likely have concluded that the relationships existed among the defendants and the investors, wherein the defendants purportedly acted for the benefit of investors and induced investors to relax their ordinary care and vigilance. I agree, but we don't, what Shields doesn't have is a PPM that time after time after time says, there are conflicts of interest between us. There is no trust relationship between us. You need to rely on your own advisors. That doesn't mean they can say anything they want. They can't make flat out lies. They can't make false statements, but you can't rely on omissions theory. That's the distinction here. You can't make false statements whether you have a trust relationship or not. Absolutely. You're right, Your Honor. But if they want to rely on omissions theory, that you didn't say X, you didn't say Y, then they need to show a trust relationship. And we have a PPM that on its face, there are cases that say based on this language, as a matter of law there was no trust relationship. Mr. Coleman, they got millions of dollars from thousands of investors. There was clearly a trust relationship. There's, I mean, we've cited cases where this happens all the time. People give out their memorandums that set forth the terms of an investment offering. And if there is cautionary language in the terms of the offering that says there is no trust relationship, there are conflicts of interest, that that you don't at this point, the court doesn't have to find as a matter of law there was no trust relationship. But they also, their theory wasn't just omissions. Mr. Stewart drafted false documents and made false representations to investors about the financial condition and stability. Well, again, we submit that he did not. And that was a major bone of contention in the case was that if you go through that PPM, there are no false statements. And, in fact, we've, I mean, the government has distorted that PPM. We pointed out in our reply brief they're making contentions that the PPM said one thing, that, for example, that the opportunity fund was an escrow on a property. And it absolutely did not say that at all. There was, that's the critical thing here is that, yes, they did rely on a false statement theory, but that was heavily contested. The PPM seriously undermined the false statement theory, and that's why they had to heavily rely on omissions theory as well. And in that situation, under this court's case law, particularly Garrido, when they heavily rely on the potentially invalid theory of liability, we can make out the third and fourth prongs of the. Didn't they say that PPA's financial position was strong, that it had substantial cash flow, and it had been successful in arranging further bank financing of its current properties despite the palatable real estate market? No. And if you look at that PPM, you won't see any of that. I urge you to read the PPM. That's just their soft statements. Oh, our position was strong. There's nothing in the PPM that says our financial position was. Well, the PPA, doesn't it say that during the first six months of 2008, it had received over $50 million in refinancing proceeds, quote, unquote? Yes. And then those were defined as the proceeds from institutional and private financing of real property. Correct. And that they knew that they had been unable to obtain any refinancing during that period. So why isn't that a false statement? Because the term was defined as private refinancing, and that was the way it was defined in the PPM itself. The PPM says this is not according to GAAP. If you were to take away these earnings, there would be nothing. The lead investor in the Opportunity Fund testified. He testified that he knew exactly what they were doing. He was not deceived by that. He knew that they were including the private investor money in that figure. He specifically testified to that and that he wasn't deceived by it. And this was, what I'm saying is, I'm not saying the evidence was insufficient, but what I'm saying is this was a hard-fought case where these issues were debated vigorously. And I urge you to read the closing arguments. There was a vigorous closing argument responding to their false statement theory. And what we have here is an invalid theory of liability, an omissions theory, which without a trust relationship, they heavily relied on that theory in their closing arguments throughout the case, in their witness examinations, in the indictment. And when you have a potentially invalid theory and you have a hard-fought case like this and there is a debatable question as to whether there was a trust relationship, your honors may look at it and think, well, we think maybe there was a trust relationship. But the point is that there was a valid defense that there was no trust relationship based on that language in the PPM. And you don't have to find that the evidence was insufficient as a matter of law under the third and fourth prongs of the plain error test. You just have to find that there is a valid, potentially valid defense and that, therefore, there's prejudice. So, yes. Mr. Coleman, if I could go back to your Shields claim for just a minute. The way I get your Shields claims, it's plain error because the court did not instruct on the duty to disclose the fiduciary relationship. Is that it? Yes. The district court did. And in Shields, the Court of Appeals held that the error did not affect Mr. Shields' substantial rights because the jury could conclude that there was a trust relationship. It's not could. And I think that these are important terms. Okay. The question is, is there a reasonable possibility that the jury convicted under an invalid omissions theory of fraud? That's the standard. And in this case, it's our position that there is such a reasonable possibility. There is certainly a possibility that a jury based on that PPM and that language in that PPM could find that there was no trust relationship. Maybe they could. Maybe they could find there was a trust relationship, but they just as easily could have found no trust relationship based on that language. And then the second question becomes, could the jury have relied on omissions to convict as opposed to false statements? And it's our position is, yes, they could have, given the heavy reliance on the omissions. And given that PPM, it was a strong defense case that there were no false statements in that PPM. And because of that, a jury, one juror, two jurors could have found that he is guilty based on an omissions theory. There is a reasonable possibility that a jury convicted under an invalid theory. And I think that's the standard. Okay. So if the evidence is so strong against your client that he was not going anywhere anyhow, then it's not plain error? If the case is so overwhelming, if this court could find – now, remember, overwhelming on a false statements theory. If the court were to find the evidence was so overwhelming on a false statements theory that we don't think this jury would have possibly could have convicted on an omissions theory, yes, you could go down that road. Okay. I think you want to reserve time. I don't want to use – I'll give you three minutes, even though I took 30 seconds. So I'll give you back up to three. Thank you. Okay. Thanks. Good morning. Good morning. May it please the Court. Brett Sagel on behalf of the United States. I'll focus on a – I'll start with a jury instruction, a model jury instruction that was submitted in this case. It's in every case. What is and what is not evidence. And what is not evidence is arguments of lawyers. And when you strip away what is – Thank heavens, because we've all heard a lot of arguments of lawyers, and we still decide the cases. Yet when I say this every time in district court, I still wind up talking, even though nothing I say is evidence. When you look at what this case actually is and you take away what it's trying to be defined as by a lawyer, this was and is a false statements case. Well, let's talk about that because I think that counsel for the appellant ended his argument with the notion that, well, if the panel finds that the evidence is overwhelming on the false statement case, then it can affirm and go down that path and not really have to deal with the omission theory part of it that's much more problematic in light of Shields. Can you summarize the strength of the evidence on the false statement case? Absolutely. Were you the trial counsel below? I was one of the two trial counsels, yes. Are you going to do – you have someone with you. Are you going to do all the argument here? I am, Your Honor. Okay, thanks. Let me start with what you don't see in any of the briefs or any of the arguments, the testimony of Wing Chau, the controller of the company, who testified that all of the balance sheets and income statements in the PPM itself were false. The $15 million, for example, that counsel just spoke of that said it mentions that it's from private money. First of all, the language in it says from institutional and private money, and in every PPM before that talked about their refinances from banks. And it's in the proceeds section. The investors weren't giving them proceeds. The investors were investing in a note in the company. That wasn't an income to the company to get private investors. But even if you want to use the throwaway word private along with institutional, it's still a half truth because there were zero institutional loans, and they knew it, and they knew it for a year and a half at that point. So if the point was to be honest and truthful, there's clearly no reason the word institutional was there other than to make people believe they were still getting refinancing, which is what they talked about time and time again in the PPM. You had Wing Chau, who gave daily updates of the PPM's financial situation to Mr. Stewart, including cash on hand and the rest, and they were losing over $2 million a month. The PPM's income statements are making it look like for the first six months of 2008, they had made $7 million, when in actuality they had already lost $7 million. You can also look at all of the language of the PPM about what the money was going to be used for. Every single line in that PPM says your money, your private investor money, will be used to acquire, renovate, and rehabilitate properties. What Mr. Stewart and his co-defendant, Mr. Packard, had already agreed was they couldn't keep operations going, they couldn't pay old investors, they couldn't pay their bank notes, they couldn't pay anything without infusion of private investor money. And they took that money and used it to pay all their old bills. That's why it was a Ponzi scheme from the minute they started doing that. And for the Opportunity Fund PPM, when they say you can't find a false statement in it, the entire PPM was a false statement. No matter how many times they said you should check with someone else, the entire PPM was a false statement because every single thing in it said you will be relying upon the management to invest your money in these properties and apartment buildings and rehabilitating the properties, and none of the money went for that. It said that we are a separate entity from anything PPA had ever done before. Your money is being used for this purpose and this purpose only. How much of the government's case and closing arguments focus on the omission theory versus affirmative false statements? Good question, Your Honor, and I would say basically none. And I say that with the caveat of we don't agree in the terminology of how the government's case was as a concealment case. And I say that in the sense of as opposed to Shields, which would go to one of Judge Pratt's questions before, I'm not even sure we get to the plain air part of the air because in Shields the omission, for example, primarily related to they talked about their successes as investors but never disclosed something material separate, which was the bankruptcy. In our case, the concealment or the omissions that we're speaking of are all part of the false statements in our case. They didn't conceal the true financial situation of PPA. Well, what they were saying was we are financially strong, we're making $7 million a year. The questions that were being posed to the witnesses and the parts where you're talking about the concealment were actually questions that fleshed out the false statements of what Mr. Stewart was saying directly to the investors. So if I understand your argument, you're saying that they were false because they didn't put certain things in them, not to hold them responsible for omissions, but they're saying that was part of your evidence as to why they were false because they didn't include certain things. In part, but to flesh out, for example, if Mr. Stewart's looking at an investor, as he did many times as the investors testified at trial, he said, we're financially strong. We're the only people who can basically buy up property in this bad market. Don't worry about the market because we have financial strength to buy all of these properties up and we can do this. And so when the questions then were asked to the witness, did he tell you that PPA was losing $2 million a month? No, he did not tell you that. Did he tell you that he was using your, when they testified that they were being told their money would be used to buy property? So the omissions essentially primarily served to demonstrate the affirmative false statements and not an omission theory per se. Exactly, and I think an omissions theory per se would be the situation where someone like Mr. Stewart has prior fraud convictions and he doesn't disclose that when he's talking about his successes as an investor or using the Shields situation. He has a prior bankruptcy on his record. And even in Shields, the argument was just by filing bankruptcy, it's not per se bad, but that's something an investor probably would want to know. Well, if an appellant, as an appellant argues saying this is an omissions case, if that were true, just have, I'm not saying it is or it isn't, but just hypothetically, if this were an omissions case, and we all agree about that, then do his arguments have traction? If this was purely an omissions case as it relates to the Shields matter of the duty to disclose and the trust relationship, they can only get to the first two parts. And for the first two prongs of the test, there's air based on Shields. We'll concede that. The plain air part, that's where I would disagree to define this as an omissions case, but assuming it is, you're there. The outcome of the case is exactly as Judge Pratt read from the Shields case, basically mirrors it here. And to say that there was no fiduciary duty or trust relationship, not only the outcome based on the number of people, the thousands of people who relied and lost millions of dollars, but you also have the very language of the defendant himself in his private placement memorandum saying, you will be relying on me to invest your money wisely. All these people are letting down their guard and trusting him to do it. And for the very reasons this Court talked about in Shields, about what they tout to make an investor lay down their guard to trust them even more, is exactly what Mr. Stewart did in this case. He talked about his decades of success, that he's a lawyer, he's a real estate broker, he's never missed a payment, never been late on a payment, despite the millions of dollars he's given to people and the 50,000 checks he's cut over a two-decade experience at PPA. Everything was meant in that PPM to make the investors feel to let their guard down, to trust him. I'd also throw out, and I understand they kind of are in different parts, but the defendant in this case, as we got to sentencing, submitted and stipulated to an abuse of trust, not about the lawyer part, but at sentencing, and you can look at their sentencing position, which is in the GER, they conceded a two-point enhancement for abuse of trust. Now, again, I understand that they're slightly different circumstances, but even the defendant realized he abused trust in this case. And so I don't think there's any way you can get past, in this circumstance, saying if this was purely an omissions case, which, again, we will say it's not, that they could say that this affected the outcome, especially in light of this Court's analysis in Shields. Well, you're not going to be able to talk about, because you don't get rebuttal, that the disparity of sentencing between, was it Packard? Yes, Your Honor. And this appellant. So my understanding is that there's bankruptcy, and so the first money went to the banks, and they didn't probably get all their money. But the people here, the private investors didn't get any money, right? The private investors didn't get any money. The banks didn't either. Pretty much the only people who got money at the end of it was Mr. Stewart's lawyers in the bankruptcy, and then there was no money or assets left in the, you know. So in the disparity, Mr. Stewart got, what, 168 months? He did. And the other, Mr. Packard, got 30. Correct, Your Honor. So the disparity, how is that supported in the record? I'll start with just the guidelines alone. Both defendants got the same base offense level, 70. Both defendants got plus 20 for loss. So they both were starting there. They both got four levels for substantial hardship to victims. So both of them got to 31 together. The defendant, Mr. Stewart, got abusive position of trust and or use of a special skill for being a lawyer and broker. Is that two or four? That one is two. So it was 33 versus 31. Then Mr. Packard got three levels because he accepted responsibility and pled guilty. And then Judge Carney, at the recommendation of the government, gave another six levels for his cooperation, not just cooperating but testifying at trial against Mr. Stewart. So that puts you at 33 versus 22 at the get-go. So obviously very different circumstance, not similarly situated, just from that alone. Then Judge Carney, and the government believes rightfully so, looked at the mitigating and aggravating factors of both defendants at the time. As related to Mr. Stewart, he was the one who wrote the PPMs, admitted by himself. He admitted that he wrote the PPMs and the language in it. He was the only one between those two defendants who had direct contacts and made the false statements to the victims. Mr. Packard was in a totally different office, dealing with banks and property management. And so those were some of the aggravating factors with Mr. Stewart. With Mr. Packard, Judge Carney found there was obviously exceptional acceptance of responsibility, his age, his personal circumstances, and mostly one of the things that the court emphasized was Mr. Packard was the sole custodian and parental unit for his minor daughter at that point. So that was something on top of that was a mitigating situation. So the starting points weren't even similar. And then the facts of the case differentiated them. And when you look at the arguments at both sentencings, first of all, I think the government's position was consistent in both of them. One, the question was about role, and neither one did we ask for a role enhancement for either. And we just argued what it was, what each defendant did in their circumstances and what it led to. And then when you look at the case law from this court, they're not similarly situated, first and foremost. And more importantly, they weren't unwarranted, even if you were to determine them. Well, I think there might be a claim or an implication that the court didn't consider their relative positions. Did the court do that? I believe absolutely, and actually on the record discussed what each of them did. I think their claim is that the government was taking a position about role and being inconsistent about their positions, but that's exactly where the discussion came up of Judge Carney. About Mr. Packard being more of a behind-the-scenes guy, Mr. Stewart, the one who's basically dealing directly with investors and drumming up money. Exactly, Your Honor. And I think that was the court's focus, and that came up at trial, and it actually came up. Most of the victims would say they didn't even know who Packard was. A couple of them said they met him at an appreciation party but didn't even know who he was. All the victims did know who Mr. Stewart was, and he was the face of the company as it related to seeking out investment money. So Mr. Sagel, simply put, it was a warranted disparity in sentence, and Mr. Stewart was a lawyer in abuse trust. Yes, and I would throw in that they weren't similarly situated. Right. I think in the appellant's brief he cites to what the government said at the Packard sentencing. Was that the same as what was said at the Stewart sentencing? I would believe yes. I was the government attorney at Mr. Packard's, not at Mr. Stewart's. Okay. But at Mr. Stewart's the question was, the guidelines doesn't take into account the role in the offense. And what the government was saying was, I understand Your Honor's position, however, role in the offense requires managing someone else, supervising other criminally culpable people, and that doesn't apply here. And the position of the government, which was me at Mr. Packard's sentencing, was saying, was as the question came up under 3553A6, unwarranted discrepancy, why the different sentences? And we're saying if you look at them individually, one dealt with investors, one did not, one is the primary caregiver of their daughter, and all the other circumstances. Well, the role I don't think played a major part in the reduction. I mean, the bulk of the reduction, because they started off a similar point, the bulk of the reduction was an acceptance of responsibility in the government's 5K1.1 recommendation, right? That brought them down seven, eight levels? Correct. The only thing that you could say was the difference was Mr. Packard's guideline range, the low end of his range was 41 months. Judge Carney did depart and had to depart to get to 30 months. Mr. Stewart got it within guideline range. So it would really be that 11-month departure under 3553, and as Judge Carney put on the record, the numerous reasons and the numerous mitigating reasons, he departed from 41 down to 30 months for Mr. Packard. Actually, he varied. Varied, yes. Thank you for correcting my misuse of terms. Okay, unless the panel has any additional questions, you've used your time. Thank you. I guess I just passionately disagree with a lot of what was said. That's why I wanted to ask it before, because I figured you were going to talk about it. And I'll try to get to the sentencing just at the end, but there wasn't an abuse of trust enhancement. There was no objection to special skill. And it's these twisting things that are going on that it's the same thing that they're doing with the PPM as well. I encourage the court, read the PPM. He comes up here and says, oh, they said the financial position was strong, and this was to buy properties. The PPM is clear. You're investing in PPA, the company. We're going to look for properties, but we haven't had any property yet. We don't have a firm purchase price on any property. That's what we're going to do, but we don't know if we're going to be able to do it. The banks are cutting down on financing. You can't get bank financing. The market is going berserk. We don't know what we're going to be able to do. It's a loan to the bank. But they come up here and they say very sincerely these generalized terms, they said that their financial position was strong. And what witness said that he said his financial position was strong? That would be the question that the prosecutor would ask. Did he tell you that his financial position was strong? Did the controller testify that every single one of the statements was false? No. The statement says, their beef with the statement is that it includes the $15 million. What's Chao? Is that his name? No. Chao would say that that $15 million should not have been put in that category. So he said it was wrong. But it wasn't false. It's not according to GAAP. And that's what the PPM said. This entry is not according to GAAP. And if you take out that entry, there's nothing there. And the lead investor in the opportunity fund said he knew that. He had spoken to Mr. Stewart about it. He looked at the PPM and the note. And he knew that's exactly what they were doing. And he was okay with it. And they just come up here and they make these statements. And then they said there was no omissions. We barely talked about omissions. Well, then why was the very first thing in closing argument, the very first thing they argued was omissions? If it wasn't an omissions case, if they weren't relying on omissions, why was that the very first thing they argued? I mean, it's just they're two completely different versions of this case, which is why it was a debatable case. And they can come up here and as sincerely being the government, get up here and say this is what the case was about. But the case was fought. It was disputed on every level. And if they didn't ---- The charging document charge. Omissions and false statements, both. The indictment itself has a section for omissions. And this is just like Garrido. They argued both. And there's a very good chance that the jury returned a verdict because they did not know that they had to find a trust relationship. And those documents themselves over and over again say, we have a conflict of interest with you. Do not rely on us. Get your own advisors because there's a conflict of interest. In bold letters, in capital letters, over and over again. So the jury could have found that there was no trust relationship. And then they could have convicted based on the omissions theory, which they asked every witness about, which the indictment alleged, and which they led in their closing argument on an omissions theory. And I urge you to read the beginning of the closing argument for the government. Thank you. Thank you.
judges: Callahan, Nguyen, Pratt